## UNITED STATES v. WATERMAN STEAM-SHIP CORP. et al.

### No. 13390.

United States Court of Appeals,
Fifth Circuit.

June 30, 1951.

500

Wm. Dewitt Reams, and Percy C. Fountain, U. S. Atty., both of Mobile, Ala., for appellant.

T. K. Jackson, Jr., Mobile, Ala., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

BORAH, Circuit Judge.

James Bradford, an employee of Waterman Steamship Corporation, was fatally injured in the course of his employment on board the vessel Thomas Nuttall by the alleged negligence of a third party wrongdoer, the United States of America. His widow and minor children claimed and accepted an award of compensation under the Longshoremen's and Harbor Workers' Compensation Act, March 4, 1927, c. 509, 44 Stat. 1424, 33 U.S.C.A. 901 et seq., which directed the employer and American Mutual Liability Insurance Company, the employer's insurance carrier, to pay compensation to Bradford's widow and minor children, and the expenses attendant upon the burial of the deceased. Pursuant to the award, American Mutual Liability Insurance Company assumed the payment of the compensation awarded.

The present suit in admiralty[1] was brought by Waterman Steamship Corporation, American Mutual Liability Insurance Company, and the administrator of Bradford's estate, against the United States of America as owner of the vessel Thomas Nuttall, and Alcoa Steamship Company, Inc., general agent for the vessel, to recover damages for the alleged wrongful death.

The libel, as amended, alleges that on April 16, 1947, one James Bradford, while acting within the scope of his employment, went down into the crank pit of the vessel Thomas Nuttall and while there an agent, servant, or employee of respondents negligently and without warning or notice, started the ship's engine, thereby causing the crank web to strike Bradford and inflict upon him injuries causing his death. Respondents, for answer, denied the charge of negligence and set up by way of affirmative defense that Bradford and Waterman were guilty of negligence which proximately contributed to the injury.

The case came on for trial and the court below found that the United States was guilty of negligence "which proximately resulted in the death of Bradford" and that neither Bradford nor his employer was guilty of negligence. Liability was based on a finding that the first assistant engineer was negligent in re-starting the engine without a warning or prior inspection of the crank pits. In its final decree, the court granted respondents' motion to dismiss the libel as to Alcoa Steamship Company and awarded to libellants the sum of $9,000 as damages, together with all costs. From this decree the United States appeals.

Insisting that the judgment may not stand, appellant assigns twenty-five specifications of error. We think, however, that the decisive question here is whether the evidence adduced justifies the conclusion that the first assistant engineer knew or should have known that one of the clean-up men might be in one of the crank pits and therefore was under a duty to inspect the pits or give a warning before re-starting the engine. This requires an examination of the facts.

In March, 1947, the Nuttall was taken out of the laid-up fleet and delivered to Waterman for the purpose of re-outfitting her for sea. When this work was com-

1. The action was brought under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S. C.A. § 901 et seq.; the Alabama Wrongful Death Statute, Sec. 123, Title 7, Alabama Code 1940; and the Suits in Admiralty Act, 46 U.S.C.A. § 141 et seq.

pleted arrangements were made between the owner and Waterman to hold a dock trial on April 16, 1947, for the purpose of testing the main engines and various auxiliary equipment in the engine room to ascertain if the repairs had been carried out in a satisfactory manner. On the morning of that day the Nuttall was moored alongside a pier in the Mobile River and at about 8:00 A.M. the vessel's engineers came aboard and went down into the engine room and started preparing to warm up the ship's triple expansion reciprocating steam engine.

A steam engine of the type here involved must be gradually warmed up until it reaches a temperature sufficiently high so that when steam is admitted to the cylinders it does not condense into water. This is accomplished by first starting the various auxiliary equipment. A small amount of steam is then admitted to the cylinders, which moves the pistons a short distance, and then by reversing the engines the pistons are moved in the opposite direction. In this manner the engine is rocked back and forth and the crank webs travel from one side of the crank pits to the other and back again in arcs which grow gradually larger until the engine is finally warm enough to make a complete revolution. The Nuttall has three crank pits, which are only large enough to accommodate the crank webs with a six inch clearance when they are rotating. When the web is straight down there is about three feet of clear space in the pit on either side of the web and when the web is on one side, there is about three feet of clearance on the other side. The low pressure crank pit in which Bradford was injured extends three feet below the engine room floor plates but together with the surrounding solid metal safety guard and hand rail makes a pit which measures about six feet deep, four feet fore and aft, and six to eight feet athwartship.

When the ship's engineers entered the engine room on the morning of the day in question, there were several employees of Waterman present, including a clean-up crew consisting of a labor foreman and four other colored laborers, including Bradford. The members of this crew had been instructed by their foreman to clean up the engine room, which covered any and every part thereof. However, the instructions did not specifically mention the crank pits, which had been cleaned a day or two before, and the ship's engineers were not advised in respect to these general instructions. It further appears that it was customary for Waterman to have a clean-up crew in the engine room during dock trials, however this custom was unknown to the ship's engineers.

Before starting the ship's engine, the chief engineer, the first assistant engineer and Waterman's mechanic, Putnam, inspected the crank pits to see whether any blocks or tools had been left therein and found the pits to be clean and free of debris. The chief engineer then notified everyone present that they intended to start the engine and to stand clear but members of the clean-up crew denied receiving any such warning. They also denied that the engine had been running at all that morning up until the time when the accident occurred. However, the preponderance of the evidence clearly supports the finding that the engine had been rocking for between eight and twenty minutes prior to the accident.

While the engine was rocking, the first assistant engineer was at the controls. The chief engineer was busy inspecting the operation of the machinery and, while swabbing the rods and examining the main bearings, he twice had occasion to look into the low pressure crank pit and saw nothing unusual. But about five minutes before the accident the chief engineer saw Bradford leaning up against the air chamber of the ram bilge pump, near where the rods from the bilge pump move up and down in movement with the engine, and pointing to the moving parts indicated to Bradford that he was standing in a dangerous position. At about this time it was discovered that a plug was missing from the air pump and Waterman's mechanic, Putnam, was sent to the storeroom to obtain a plug. When Putnam left the engine room the engine was rocking and when he returned about five minutes later

and while standing on a platform located astern of the engine, he heard an outcry. And looking, he saw Bradford in the center of the low pressure crank pit, moving as fast as possible toward the forward starboard corner. Putnam immediately called for the first assistant engineer to stop the engine, which he promptly did, but before the heavy crank web could be stopped it had moved from port to starboard and crushed Bradford. Putnam believed that the engine was rocking when Bradford got into the pit. Woodward, an employee of Waterman, saw Bradford as he was scrambling trying to get out of the pit, at which time the web was rocking and moving to the port side. Williams, a member of the clean-up crew, claims to have seen Bradford on the port side of the pit at about 7:30 A.M. when he first came to work, which he claims was about three minutes immediately preceding the accident. No witness saw Bradford enter the pit.

The trial judge found that the "rocking motion of the engine was stopped, that while it was stopped, Bradford, in furtherance of his employment, climbed into the low pressure crank pit to clean it, and that the first assistant engineer, an employee of the respondent, United States, then restarted the main engine without first giving a warning or inspecting the low pressure crank pit when he knew of the presence of the clean-up men in the engine room and knew, or should have known, that one of them might be in the said pit and be injured by the starting of the engine."

The finding that the engine had been stopped and was restarted by the first assistant engineer immediately prior to Bradford's injury finds but little support in the record. Woodward saw the first assistant engineer turn one of the engine controls immediately prior to Bradford's injury and a member of the clean-up crew saw someone turn a valve at the controls of the engines about a minute and a half before he heard Bradford scream. Neither of these witnesses testified that the first assistant engineer was turning a control valve in such a manner as to stop or start the engine and the first assistant engineer stated that he turned the control valves from time to time while the engine was rocking, making minor adjustments in the amount of steam going into the cylinders as the engine warmed up. Another Waterman witness, Carr, testified that he was in the storeroom of the engine room at the same time Putnam was there and that the ship's engine was not rocking. He did not look to see whether the engine was rocking but based his opinion on the fact that he did not feel any vibration. However, he did not know whether there would be any vibration if the crank was merely rocking slowly. On the other hand, the first assistant engineer, who was at the controls, was positive that the engine had not been stopped from the time it first started rocking until after the time of Bradford's injury. The Chief Engineer and the fireman both stated emphatically that the engine rocked continuously from the time it was first started until Bradford was injured. Waterman's technical supervisor, Repp, was of the opinion that the engine was rocking between 90 and 180 degrees and was nearly ready to start turning over at the time when he left the engine room some three to five minutes before he received word that Bradford had been injured. In addition, Putnam's testimony that the engine was still rocking when he returned to the engine room was based on the fact that it would, in his opinion, have been impossible during his absence to stop and re-start the engine and cause the crank web to move with the speed with which it was moving when Bradford yelled. Moreover, there was no necessity or need for stopping the engine. It is not reasonable to assume that the engine was stopped because of the missing plug for it affirmatively appears that the engine was running without the plug at the time when Bradford was injured.

But accepting the trial judge's finding that the engine was stopped and restarted, we are of opinion that the defendant was not guilty of negligence. This record does not show the circumstances under which Bradford entered the pit or the reasons, if any, therefor and the mere

fact that an accident occurs does not in itself warrant the conclusion that someone has been guilty of negligence. Nearly all human acts have some remote possibility of harm to another. But there is no liability for an occurrence which under all the circumstances could not have been foreseen or prevented by the exercise of such precautions as a reasonable man doing such an act then and there could be expected to take. "Negligence has been defined to be 'the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do.'" The Nitro-Glycerine Case (Parrot v. Wells, Fargo & Co.), 15 Wall. 524, 82 U.S. 524, 536, 21 L. Ed. 206. In other words, it is any conduct "which falls below the standard established by law for the protection of others against unreasonable risk of harm." A.L.I. Restatement of Torts, § 282. In the light of the circumstances disclosed by this record, we do not think that a reasonably prudent man, exercising those qualities of attention, knowledge, intelligence and judgment which society requires of its members would have or should have anticipated that someone might be in the crank pit.

Further, if we accept the trial court's finding of negligence, as we are unwilling to do, we think it plain that the contributory negligence of the deceased is a complete defense to this action. Truelson v. Whitney & Bodden Shipping Co., 5 Cir., 10 F.2d 412. If libellant's testimony is to be accepted it is clear that the engine was stopped for a period of not more than three to five minutes. Shortly before the accident Bradford was seen standing near where the rods from the ram bilge pump were moving up and down in movement with the engine. He was then within three and one half feet of the low pressure crank pit and therefore knew or should have known that the crank web was rocking and that the crank pit under the attending circumstances was obviously a dangerous place to be. If, despite this knowledge, he failed to exercise ordinary care for his own safety, by climbing into the pit where he could not see nor be seen by the operator of the engine and without notifying anyone of his intentions, he was guilty of contributory negligence.

The judgment of the District Court is reversed.